(No. 48892.—

*In re* LEE MARSHALL HOWARD, Attorney, Respondent.

*Opinion filed October 5, 1977.—Modified on denial of rehearing January 26, 1978.*

John C. O'Malley, of Chicago, for the Administrator

of the Attorney Registration and Disciplinary Commission.

Rizzi & Rathsack and Leonard M. Ring, of Chicago (Dom J. Rizzi and Michael W. Rathsack, of counsel), for respondent.

MR. JUSTICE MORAN delivered the opinion of the court:

Pursuant to Supreme Court Rules (58 Ill. 2d R. 751 *et seq.*), a disciplinary proceeding was brought against respondent, Lee Marshall Howard, for engaging in unprofessional and unethical conduct tending to defeat the administration of justice and to bring the courts and the legal profession into disrepute.

A hearing panel (Panel) of the Attorney Registration and Disciplinary Commission found misconduct on the part of the respondent and recommended that the Administrator of the Commission and respondent agree to a reprimand of the latter pursuant to Commission Rule 9.4. The Administrator declined, and the majority of the Panel then recommended, "with reluctance," that the matter be dismissed. One member, in dissent, recommended that respondent be suspended from the practice of law for six months. The Review Board (Board) reversed the Panel's recommendation and unanimously recommended that respondent be disbarred.

The respondent was admitted to the practice of law in Illinois on April 28, 1960. In December of 1973, he was indicted in Cook County on three counts of bribery and, after trial, was acquitted of the criminal charges. A complaint, based on the same transaction, was filed by the Administrator on July 11, 1975. It alleged that, in the course of respondent's defense of a client, he had, on two separate occasions, given $50 to the arresting officer, Jerry Maculitis, and, on a third occasion, told Maculitis that he would "probably be spending some money with the State's

Attorney" and would "take care of the judge." Other than respondent's character witnesses, only the respondent testified at the disciplinary proceeding before the Panel. Officer Maculitis was not called.

Respondent testified to the following account. At the time of the case which gave rise to the charges, his legal practice consisted largely of divorce and real estate matters. Although he handled very few traffic cases, he was prevailed upon to defend Charles Graber, a friend of a client, against a charge of driving while intoxicated. On June 27, 1973, the respondent appeared for Graber at the Elk Grove Village courthouse, where he had never previously practiced. He inquired of an assistant State's Attorney if he might see the arresting officer's report. He was told he would have to get it from the arresting officer, Maculitis. Respondent located Maculitis, identified himself as the attorney representing Graber, asked for and received the report. The report included the "breathalizer" test results and a document known as the "visual" report—an account of the arrestee's demeanor, appearance and responsiveness, based upon the officer's unaided observations. Respondent took several minutes to read it, and noted that it stated his client's attitude on the night of the arrest was "carefree and talkative." To his reading, his client's reported responses to the officer's questions were "extreme." The respondent testified that the officer expressed dislike for Graber, indicated that he "really buried my man on the visual," threatened "If you don't take care of me, I am going to bury this guy," and told respondent that he (the officer) required $50 which was the "going rate" for cases of that kind. To this, respondent assertedly responded:

> "[I] f I give you Fifty Dollars will you testify in accordance with the visual as to the carefree and hilarious and talkative, joking manner that you have indicated on your visual?"

He explained, in his testimony before the Panel, that he wanted to be sure the officer gave such testimony because "the responsive answers on the visual were so extreme that [he] couldn't believe it." When respondent reached into his pocket, Maculitis asked that the two of them walk to the washroom, where respondent gave the officer $50.

Respondent further testified that on August 1, 1973, he sought a continuance at the Elk Grove Village courthouse. As he left, he was stopped by Maculitis, who asked his name and said something like, "You are the fellow who put $50 in my pocket." Respondent asserts that the officer asked how respondent wanted him to testify, to which respondent replied that he would have to testify in accordance with the visual report. The officer then asked for an additional $50, and respondent answered, "No problem." The respondent remarked, "I am probably going to have to spend some money with the State's Attorney," and stated that he had things "pretty well set with the judge." He asserts that these statements were made to get away from the officer because he (respondent) was late for a court date elsewhere. To explain his statement regarding the judge, the respondent indicated that he had known the judge assigned to the case during all of his professional life, and knew that "If I had a good case at all, I would get a favorable verdict. The evidence would satisfy him." He denied having improperly talked with the judge or the State's Attorney regarding the case.

On August 27, 1973, the Graber case came up for trial and, prior to being called, the respondent talked with Maculitis outside the courtroom. The officer asked if respondent had the $50, and respondent answered that he did not, that it was up to Graber as to whether or not he would be paid and Graber was not yet in the court. When Graber arrived, he agreed to pay the extra $50 and the respondent nodded his assent to the officer in the courtroom. Respondent testified as follows regarding the

trial.

"Q. Would you tell us what questions you asked Mr. Maculitis?

A. I asked him, 'When you talked to Mr. Graber, was he courteous at all times?' His answer was 'Yes.'

Q. What was the next question?

A. 'As a matter of fact, when you were discussing matters with Graber, you were joking and Mr. Graber was joking?' and he said, 'Yes.'

Q. Anything else?

A. 'And some of the responses he gave you may have been in the course of joking and good natured fun' and he said, 'Yes.'

Q. Those are the only questions you asked Mr. Maculitis?

A. It is."

The judge found Graber not guilty of driving under the influence of alcohol, but found him guilty of a lesser offense. As respondent left the courtroom, Maculitis asked him how he had done and respondent answered, "Super." The officer then motioned to the washroom, respondent followed him, and, in response to the officer's motion toward his pocket, the respondent placed $50 therein. Maculitis then handed him a grand jury subpoena.

Respondent argues that he was entrapped into giving the officer the money by the latter's statement that he would otherwise "bury" his client. He asserts that his motive was to insure that the officer would testify to the truth and in accordance with the visual, and maintains that he did not tell the officer to testify to anything other than the truth as represented in the visual report.

This court notes that the visual report contains no references to Graber having been courteous or to there having been any joking between Graber and the officer, although Graber's attitude was described thereon as "hilarious" and his answers could be characterized as "joking."

At the disciplinary hearing, 16 attorneys, including a

circuit court judge, and three lay witnesses testified to the respondent's character for truth and integrity in the community and in the profession. The Administrator stipulated that 13 additional attorneys and five more lay witnesses would testify similarly if called.

The Panel concluded, in pertinent part, that the arresting officer's statement threatening to bury respondent's client was made with the intention of stimulating unlawful intentions, and that he solicited and encouraged the bribe; that no motive was established for the giving of the second $50 after Graber was acquitted; that the respondent's testimony that he gave the officer $50 for the sole purpose of testifying according to the visual was incredible; and that the respondent's assertions of having things set with the judge and spending some money with the State's Attorney were detrimental to the legal system and tended to undermine public confidence in it. The originally recommended reprimand underscored the Panel's dissatisfaction with the respondent's explanation of his motive. It stated:

"We do not believe, and we consider it an insult to our intelligence for you to suggest that you paid the money to the officer in order to get him to tell the truth."

When the Administrator did not consent to the Panel's recommended reprimand, the Panel, "with reluctance," recommended dismissal of the charges. The Board reversed the Panel's recommendation and unanimously recommended disbarment of the respondent, strongly concluding:

"[T] he Board considers this case and the clear issue raised by the proceedings below to constitute a most striking example of a breakdown of basic concepts of legal integrity and a most serious challenge to the credibility of the judicial process."

The respondent argues that the recommendation of the Board is not supported by clear and convincing

evidence, that disciplinary action against him should be barred because of entrapment, and that a disbarment is not warranted by the record.

Addressing respondent's first contention, his own testimony, summarized above, establishes that he twice paid $50 to a police officer with the intention of influencing his testimony. Whether it was to influence his testimony to be truthful or otherwise, such acts have the clear appearance of impropriety, bring law officers, the legal profession, and the court into disrepute, and hinder the administration of justice. We cannot fail to note that the Panel, which was in the best position to judge the credibility of the witness, expressly disbelieved respondent's assertion that his sole motivation was to have the officer testify to the truth. Additionally, respondent's statements regarding paying the State's Attorney and having things set with the judge have a profoundly detrimental effect upon the legal profession and the judiciary, and manifestly constitute unprofessional conduct.

The respondent has relied primarily upon a defense of entrapment. The Panel concluded that the officer's statement threatening to "bury" the defendant was to induce respondent to make the first $50 payment. In that connection, the Panel cited *In re Horwitz* (1935), 360 Ill. 313. The respondent urges that the holding in that case demonstrates the availability of the defense of entrapment in disciplinary proceedings. The facts in *Horwitz*, however, are totally inapposite to those here. In *Horwitz*, an attorney was lured by an elaborate scheme into filing a false personal injury claim, the falsity of which, the court concluded, he did not know until disciplinary proceedings were filed against him. The court therefore declined to impose discipline for his unwitting act. In the case before us, the respondent twice paid the arresting officer, an opposing witness, $50 in the men's washroom, and made

statements clearly indicating illicit dealings with the court and the State's Attorney's office. Under no set of circumstances could these acts be deemed professionally proper, and the respondent, at the time of such acts, must have been completely cognizant of their unsavory quality.

Furthermore, entrapment here, if any, arises totally from the officer's alleged solicitation of money for testimony, to which the respondent knowingly acquiesced. Assuming *arguendo* that the defense of entrapment under *Horwitz* is available generally in disciplinary hearings (but see *Kee Wong v. State Bar* (1975), 15 Cal. 3d 528, 542 P.2d 642, 125 Cal. Rptr. 482, and *cf. In re Schwarz* (1972), 51 Ill. 2d 334, wherein the defense of testimonial immunity is held inapplicable in attorney disciplinary proceedings), we do not believe the facts of this case establish entrapment.

Rejecting that defense, the court in *People v. Hall* (1962), 25 Ill. 2d 297, 301, indicated:

"[B] y defendant's own testimony, it appears that no undue, prolonged or persistent pressures were exerted against him \*\*\* and that he quickly complied with the request to obtain narcotics once his suspicions of [the] officer \*\*\* were allayed and he was sure it was safe. Indeed, defendant at no time sought to avoid the issue nor did he at any time express or display an unwillingness [to commit the offense] \*\*\*. Under these circumstances we cannot say there was such deception and unfairness as makes it unconscionable for the State to press its case, or which permits defendant to avail himself of the defense of entrapment." *People v. Hall* (1962), 25 Ill. 2d 297, 301.

In the case at bar, the very existence of the visual report, provable in court, challenges the credibility of respondent's asserted fear for his client. To "bury"

respondent's client the officer would have had to offer testimony contradictory to his own report. Accepting *arguendo* respondent's own theory of his motive, it is difficult to see, in such context, how the officer's single statement could constitute undue pressure, and the basis for respondent's alleged fear seems ephemeral at best. Moreover, respondent's lack of reluctance in meeting the alleged demand, and his ready negotiations regarding what the $50 would buy for him, indicate a receptivity inconsistent with the defense of entrapment.

The respondent urges that the recommendation of the Board is not supported by clear and convincing evidence. To bolster this contention he argues he was twice found innocent of wrongdoing: once by the decision of the circuit court of Cook County and, again, by the Panel's final recommendation to dismiss the complaint. However, we point out that evidence deemed insufficient to convict respondent on criminal charges may be sufficient to show a deviation from required standards of conduct, warranting disciplinary action. (*In re Goldstein* (1952), 411 Ill. 360, 366.) Furthermore, to characterize the Panel's recommendation in this proceeding as equivalent to a finding of innocence is absurd. The Panel found the respondent's conduct unprofessional and recommended dismissal of the proceeding only "with reluctance."

Respondent next asserts that the record does not contain clear and convincing evidence that his motive was improper, inasmuch as the only evidence adduced on that issue was respondent's own testimony that he wanted the officer to simply testify to the truth. This argument has numerous flaws. It incorrectly assumes that there can be a proper motive for influencing testimony—to assure truthful testimony. We flatly reject such contention. The damage that would immediately accrue to our system of justice, should it be acceptable to pay for truthful testimony, is manifest. Respondent's argument is addi-

tionally negated by the fact that his own testimony was found by the Panel to be implausible. Since the actual documentary evidence of the visual was available for introduction at trial, and since that visual, as a whole, can only be characterized as very damaging to the respondent's client, the evidence supports a conclusion that respondent's motive was to influence the officer to testify to something other than, or less than, the truth. Furthermore, respondent's explanation of his motive for telling the officer he would be spending money with the State's Attorney's office and had things "set" with the judge was as follows: "I did that in order to get him off my back. I wanted to get out of there. I was late for court downtown." Clearly, then, respondent's own testimony established that self-interest motivated his improper statements to the officer. An attorney is required to subvert self-interest to the interests of his client and the preservation of the integrity of the law. In a context such as this, where self-interest prompts an attorney to a patent and serious breach of professional conduct, self-interest is indisputably an improper motive.

The discipline to be imposed in each case must be judged individually, based on the specific circumstances and conduct involved. *Stare decisis* cannot readily be applied in determining the appropriate discipline. (*In re Leonard* (1976), 64 Ill. 2d 398, 404.) The fact that the respondent erred, not once, but on three separate occasions—twice making payments to influence testimony, and once indicating he would "spend money" with the State's Attorney and that he had "set" things with the judge—indicates that respondent's actions were not the result of carelessness or a momentary lapse of judgment. The acts he has admitted reveal serious and indefensible breaches of regard for required professional conduct. His actions discredit the bar and the entire judicial process.

We have considered carefully the extensive evidence of

the respondent's good character and beneficial community involvement. While such evidence is no defense to the substantive misconduct revealed here, it may be considered in mitigation of discipline. *In re Costigan* (1976), 63 Ill. 2d 230, 236-37.

On the basis of all factors herein, it is our considered judgment that respondent should be suspended for a period of two years.

*Respondent suspended.*