(No. 50593.—▮▮▮▮▮▮▮▮▮)

*In re* MORTON EFRAM FRIEDMAN, Attorney,
Respondent.

*Opinion filed March 14, 1979.*

UNDERWOOD and RYAN, JJ., concurring in the decision.
WARD, J., took no part.
CLARK and MORAN, JJ., dissenting.

John C. O'Malley, of Chicago, for the Administrator
of the Attorney Registration and Disciplinary Commission.

William J. Martin, Ltd., of Chicago, for respondent.

MR. CHIEF JUSTICE GOLDENHERSH delivered the
decision of the court and the following opinion in which
MR. JUSTICE KLUCZYNSKI joins:

The Review Board of the Attorney Registration and
Disciplinary Commission recommended that respondent,
Morton E. Friedman, licensed to practice law in Illinois on

May 21, 1964, be censured. The two-count complaint filed by the Administrator of the attorney discipline system on May 12, 1976, charged that respondent, while serving as chief of the criminal division of the Cook County State's Attorney's office, was guilty of conduct tending to bring the legal profession into disrepute and violative of four Disciplinary Rules of the Code of Professional Responsibility: Disciplinary Rule 7—102(A)(6) (creation of false evidence), Disciplinary Rule 7—102(A)(4) (knowing use of false evidence), Disciplinary Rule 7—109(B) (secreting of a witness), and Disciplinary Rule 1—102(A)(4). The Hearing Board of the Attorney Registration and Disciplinary Commission found that respondent did not violate the Code of Professional Responsibility and recommended that the complaint be dismissed with prejudice. The Administrator filed exceptions with the Review Board. After consideration of briefs and oral argument, a report signed by three members of the Review Board was filed, recommending that respondent be censured. A second report, signed by two members of the Review Board, recommended that the report of the Hearing Board be affirmed. The three remaining members of the Review Board (one vacancy existed at the time) did not participate. The concurrence of five members of the Review Board is required for a decision (Supreme Court Rule 753(d) (58 Ill. 2d R. 753(d))) and the Board granted respondent's motion for reconsideration. On February 28, 1978, the Review Board issued a second report and recommendation in which a five-member majority recommended that respondent be censured while three members, with a written dissent, voted that the complaint be dismissed with prejudice.

The facts are not in dispute and have been stipulated by the parties. The occurrences which gave rise to count I have previously been considered by this court in *In re Howard* (1977), 69 Ill. 2d 343. In March 1973 Charles

Graber was arrested by Officer Jerry Maculitis and charged with driving while under the influence of alcohol. Respondent was informed that Officer Maculitis believed he had been solicited to receive a bribe from Graber's attorney, Lee Howard. Respondent met with Officer Maculitis and directed him to follow Howard's instructions even if those instructions included testifying falsely in favor of Graber. Howard told Maculitis that the defense would not be ready to proceed if the breathalyzer operator were present. Maculitis was instructed by respondent to arrange for the absence of the breathalyzer operator, who, however, on the day of the trial, appeared in court to testify. Following respondent's instructions, Maculitis falsely advised the court that the breathalyzer operator was unavailable. The charges against Graber were dismissed. In a washroom adjacent to the courtroom Maculitis was given $50 by Howard, who was later indicted for bribery.

During the first recess of court after the disposition of the Graber case, an assistant State's Attorney, acting upon the respondent's instructions, advised the associate circuit judge of the circumstances surrounding the case.

The charge contained in count II of the Administrator's complaint arose from facts which have also been before this court. (*People v. Powell* (1978), 72 Ill. 2d 50.) Juanita Guevara was arrested by Chicago police officer Jose Martinez and charged with the aggravated battery of Awilda Torres. In July 1973 respondent was told that Martinez had been approached by Guevara's attorney, Paul Powell, and was solicited to receive a bribe. Respondent instructed Martinez to give the appearance of cooperating with Powell. After meeting with Powell, Martinez told respondent that Powell had offered to pay him if he would arrest Ms. Torres and use the threat of prosecution to persuade her to drop the charges. Respondent instructed Martinez to tell Powell that the complaining witness had

been persuaded to drop the charges. Martinez was also told that if he were called as a witness at the preliminary hearing, he should advise the court that Torres did not wish to appear. Although Torres and her mother appeared in court ready to testify at the preliminary hearing, they were advised of the pending investigation concerning Powell's conduct and escorted to the State's Attorney's office, where they remained until the preliminary hearing was concluded. The assistant State's Attorney in charge moved that the case be stricken with leave to reinstate. Before ruling on the motion the court asked that Martinez be placed under oath in order to verify the reason for the request, and Martinez testified falsely that he had spoken to Torres and her mother and had been advised that they did not wish to prosecute. The court then granted the State's motion to strike with leave to reinstate. After the preliminary hearing Martinez met Powell in the latter's car and was paid $250. Powell was later indicted and convicted of bribery. Immediately following the preliminary hearing the court was advised of the reasons for Martinez's testimony. The charges against Guevara were later reinstated.

This case presents the questions whether disciplinary action is merited and, if so, the nature of the sanction to be imposed when a prosecutor admittedly engages in conduct violative of the Code of Professional Responsibility for the purpose of developing evidence to be used in a subsequent prosecution. The parties have not cited nor has our research disclosed any analogous cases previously considered by either a court or disciplinary committee.

Analogizing to the court-tolerated deceit employed in narcotics investigations (*United States v. Russell* (1972), 411 U.S. 423, 36 L. Ed. 2d 366, 93 S. Ct. 1637; *United States v. Sorrels* (1932), 287 U.S. 435, 77 L. Ed. 413, 53 S. Ct. 210), respondent argues that "the courtroom is not immunized by the Code of Professional Responsibility

from investigation methods otherwise lawful and ethical" and that perjury and the secreting of witnesses are necessary methods for the successful investigation and prosecution of corrupt attorneys, whose stealth makes less deceptive investigatory techniques ineffective. He contends, too, that motive and intent must be considered in judging the ethics of respondent's conduct, and that respondent's lofty motive negates any technical violation of the Code of Professional Responsibility. Any intent to subvert the judicial processes in the two cases, respondent argues, originated not with him, but with attorneys Howard and Powell.

The Administrator contends that deceit and deception, although permissible in drug investigations, may not be employed to mislead or deceive a court while hearing one matter in order to develop evidence to be used in another proceeding, and that motive is not relevant to the question whether there has been professional misconduct and should be considered only in determining the appropriate sanction to be imposed.

ABA Standards, The Prosecution Function, section 1.1(d) (1971), states that "It is the duty of the prosecutor to know and be guided by the standards of professional conduct as defined in codes and canons of the legal profession, and in this report." It provides, too, that it is "unprofessional conduct for a prosecutor knowingly to offer false evidence, whether by documents, tangible evidence, or the testimony of witnesses." (ABA Standards, The Prosecution Function sec. 5.6(a) (1971).) Although this court has not formally approved the Code of Professional Responsibility adopted by the American Bar Association, it frequently serves as a guide for standards of professional conduct. (See *In re Spencer* (1977), 68 Ill. 2d 496; *In re Taylor* (1977), 66 Ill. 2d 567.) The complaint charged the violation of Disciplinary Rule 1–102(A)(4), which generally proscribes "conduct involving dishonesty,

fraud, deceit, or misrepresentation," and violations of Disciplinary Rule 7—102(A)(4), Disciplinary Rule 7—102(A)(6), and Disciplinary Rule 7—109(B), which provide:

> "DR 7—102(A) In his representation of a client a lawyer shall not:
>
> * * *
>
> (4) Knowingly use perjured testimony or false evidence.
>
> * * *
>
> (6) Participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false."

> "DR 7—109
>
> * * *
>
> (B) A lawyer shall not advise or cause a person to secrete himself or to leave the jurisdiction of a tribunal for the purpose of making him unavailable as a witness therein."

That respondent's conduct has deviated from these rules is apparent; respondent himself admits that were it not for his motives he would be in violation. He argues that to impose discipline for his conduct would give more emphasis to the abstract concept of a courtroom's sanctity than to the substances of an honest legal system. While respondent asserts that he is not arguing that the end justifies the means, we so construe his argument and find it unacceptable. The integrity of the courtroom is so vital to the health of our legal system that no violation of that integrity, no matter what its motivation, can be condoned or ignored. Although arising out of a different context, we find apposite the words of Mr. Justice Brandeis in *Olmstead v. United States* (1928), 277 U.S. 438, 485, 72 L. Ed. 944, 959-60, 48 S. Ct. 564, 575 (dissenting opinion):

> "Decency, security and liberty alike demand that government officials shall be subjected to the

same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a law-breaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face."

Respondent's contention that no alternative methods were available to insure the successful prosecution of corrupt attorneys is also unpersuasive. As the above-quoted language indicates, even if no other ways existed to ferret out bribery, the respondent would still not be privileged to engage in unethical (and perhaps illegal) conduct. Moreover, in the present case alternatives were available to investigate and prosecute the suspected attorneys. They could, for example, have been charged with solicitation of perjury (Ill. Rev. Stat. 1977, ch. 38, pars. 8–1, 32–2) or attempted bribery (Ill. Rev. Stat. 1977, ch. 38, pars. 8–4, 33–1). Respondent maintains that as a practical matter convictions are virtually impossible to obtain unless the crime has been consummated and the money has been paid, that even when these circumstances are present conviction is still very difficult. Such factors cannot, however, justify respondent's conduct.

Because respondent acted without the guidance of precedent or settled opinion and because there is apparently considerable belief (as evidenced by the letters

and affidavit supporting respondent) that he acted properly in conducting the investigations, we conclude that no sanction should be imposed. (See *In re Luster* (1957), 12 Ill. 2d 25.) It appears that respondent has otherwise served the public diligently and with integrity and acted in the present matter not out of self-interest, but from a sincere, if misguided, desire to bring corrupt attorneys to justice. In light of all these considerations, we hold that no discipline will be imposed.

*Respondent discharged.*

MR. JUSTICE UNDERWOOD, concurring in the decision:

Of the 11 members of the hearing panel and Review Board who have expressed opinions on the stipulated facts before us, six (the entire hearing panel and three members of the Review Board) have considered that respondent's conduct violated no ethical proscriptions. I agree, and while I do not join in the finding of impropriety contained in the Chief Justice's opinion, I do join in discharging respondent, rather than dismissing the complaint, so that we may have the constitutionally required concurrence of four members in the action to be taken (Ill. Const. 1970, art. VI, sec. 3).

The Administrator's case against respondent consisted solely of a statement of facts stipulated to by respondent. In contrast, respondent, after testifying fully and candidly that he accepted full responsibility for the conduct now alleged to be improper, introduced the expert testimony of James B. Zagel, the then chief of the criminal justice division in the office of the Attorney General of this State, and some 35 affidavits, statements and letters from both Federal and State judges and prosecutors, the Governor of Illinois, a law school dean and professors, criminal defense attorneys, and others. Many of these, in addition to attesting to respondent's excellent character and impec-

cable integrity, viewed the undisputed facts as involving no professional impropriety. Notable among them is Monroe H. Freedman, formerly dean of, and currently professor at, Hofstra University Law School, a former faculty assistant at Harvard Law School and professor of law at George Washington University. Professor Freedman specializes in the field of lawyers' ethics and has written extensively on the subject. His book *Lawyers' Ethics in an Adversary System* has been characterized as the best in the field of legal ethics. Professor Freedman, who was serving as chairman of the Committee on Professional Responsibility of the Society of American Law Teachers, has also served or is serving in many other positions of responsibility in the professional ethics field. He indicated that "[m]otive is, of course, a primary consideration in making judgments regarding the ethical quality of conduct." (M. Freedman, Lawyers' Ethics in an Adversary System 83 (1975).) In his statement in this case, submitted in affidavit form, he indicates his opinion that the proper construction of the ABA-approved Code of Professional Responsibility Rules proscribing the knowing use of false evidence, deceit and misrepresentation restricts the application of those rules to situations in which the responsible attorney engages in such conduct with the intent not to reveal the fraud and deception to the affected person or tribunal. In Dean Freedman's opinion, the complaint in this case should be dismissed for respondent was carrying out his express ethical obligation as a prosecutor to "improve the administration of criminal justice." ABA Standards, The Prosecution Function sec. 1.4 (1971).

The former assistant chief counsel of the Senate Select Committee on Presidential Campaign Activities (the Senate Watergate Committee), after reviewing the stipulated facts in these charges, characterized respondent's conduct as not only devoid of any basis for disciplinary action but as "in

the highest traditions of law enforcement."

Professor James B. Haddad of Northwestern University's School of Law, a former first assistant in the Cook County State's Attorney's office during a part of the period respondent served as chief of the criminal division in that office, who is also experienced in the defense of criminal cases, submitted a statement detailing his observations regarding the handling of criminal cases in Cook County courts during respondent's tenure as chief of the criminal division in the State's Attorney's office. Without extending this opinion by including the details related in that statement, it is apparent that the pernicious activities of some police officers and some court personnel were either eliminated or substantially reduced by procedural changes suggested by, or inaugurated by, respondent.

Based upon the evidence before it, a unanimous hearing panel found:

"1. Respondent did not entrap or attempt to entrap attorneys Powell and Howard. On the contrary, attorneys Powell and Howard initiated and were responsible for the bribery schemes.

2. The Respondent did not intend to deceive the court, the defendant in the pending cases, or the People, and did not intend to violate the Code of Professional Responsibility. The Respondent's sole motive was to obtain evidence against two attorneys who had initiated attempts to bribe police officers.

3. A responsible attorney in the States Attorney's office supervised the gathering of the evidence against attorneys Powell and Howard. No free rein was given to police officers or laymen to determine what testimony would be given in court, what witnesses would be made unavailable, or what other steps would be taken in court in order to gather evidence against attorneys Howard and Powell.

4. There was no practical alternative method available to the States Attorney's office to obtain the type of evidence (the payment of money) which experience had

shown was indispensable in order to successfully prove the guilt of corrupt attorneys. A failure to prosecute and convict such attorneys will have a bad effect on the morale and willingness of police officers to expose future corrupt solicitations to the States Attorney's office.

5. Respondent's conduct did not deceive, prejudice or injure the Court, the People, or the defendants in the two cases. The respective courts were not deceived because of the prompt action taken by Respondent set forth in paragraph 6.

6. The Respondent made a prompt disclosure of the true facts to the court after the dismissal of each case, and thus allowed the judge to act promptly in the event the judge felt that the Respondent's conduct had been contemptuous or that any other action should be taken under the circumstances.

7. No civil rights of any third person were violated by the procedures followed by the Respondent. For example, the Respondent refused to permit the complaining witness in the Guevara case to be falsely arrested in order to complete the attempted bribery.

8. Sophisticated and cautious corrupt attorneys carefully frame their solicitations in ambiguous language and not in the presence of other witnesses, so that a prosecution based simply on the testimony of the police officer against that of the attorney is virtually impossible as a practical matter. Such attorneys do not, as a rule, pay the bribe until they have accomplished the purpose for which they are giving the money.

We conclude that the Code of Professional Responsibility does not impose absolute liability, but requires an intent on the part of the attorney to do a wrongful act in order to constitute a violation.

We further conclude under the facts of this case, and particularly those facts set forth in paragraphs numbered 1-7 of the Findings of Fact, that the Respondent did not create false evidence, use perjured testimony or secret witnesses in violation of the Illinois Code of Professional Responsibility DR 7–102(A)(4) and (6) and DR 7–109(B). The conduct of the Respondent was not prejudicial to the administration of justice in violation of DR 1–102(A)(4), and his conduct was not unethical,

unprofessional, nor did it tend to bring the Bar into disrepute.''

In the *amicus* brief filed in his individual capacity by Thomas P. Sullivan, an able lawyer who formerly argued both criminal and civil cases in this court and now serves the Northern District of Illinois as United States District Attorney, Mr. Sullivan succinctly portrays the difficulty faced by law-enforcement personnel in cases like these. He states:

"From time to time, prosecutors receive what appear to be reliable allegations that defense attorneys in criminal cases are engaged in suborning perjury, or bribing witnesses, bailiffs, clerks, prosecutors or judges, or the like. The prosecutor to whom such allegations are made has a duty to investigate, and to prosecute those found to be corrupting the criminal process.

Usually, the hard evidence to prove these crimes is the payment of money by the defense lawyer to the witness, policeman, prosecutor, clerk, bailiff, or judge.

Usually, to obtain the hard evidence of payment, it is necessary to have one or more of the participants in the case pretend to abet the scheme. Payment usually occurs *after* the policeman, witness, prosecutor, clerk or judge has done whatever he is supposed to do; usually, the payment is made *after* the defendant is acquitted, the evidence is suppressed, the case is dismissed, or the like.

The Hearing Board's ruling recognizes the practical problems faced by the prosecutor who wishes to investigate these kinds of allegations. Contrariwise, the ruling of the majority of the Review Board, if sustained by this Court, will seriously impair investigations in cases of this kind in Illinois. The unfortunate result may well be cessation of meaningful investigations of corrupt conduct by defense lawyers, witnesses, clerks, bailiffs, and judges in Illinois.

It is respectfully submitted that this Court should not hold an Illinois prosecutor guilty of unethical conduct when, in good faith, he carefully seeks evidence to ferret out and prosecute lawyers who are engaged in corrupting the criminal process. Surely Mr. Friedman should not be censured for doing that which he honestly believed to be

a proper and ethical exercise of his sworn duty."

In an attempt to answer, my colleagues suggest that respondent had alternatives available—the suspect lawyers could have been charged with solicitation of perjury or attempted bribery. The weakness of that naive answer lies in the demonstrated fact that a prosecution of either of those charges, based upon the testimony of a single, uncorroborated witness as to the ambiguous language in which such offers are customarily made, will rarely succeed against the lawyer's vigorous denial of any criminal intent. (See *In re Howard* (1977), 69 Ill. 2d 343, where the lawyer was acquitted of bribery despite evidence of payment.)

The situation before us is analogous to that visualized by section 7—13 of the Criminal Code of 1961.

> "Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct." Ill. Rev. Stat. 1973, ch. 38, par. 7—13.

Certainly respondent was without blame in connection with the original bribe offers, and there is no doubt he believed his own conduct necessary to avoid a greater injury—the continued corruption of the judicial process by the two attorneys. That belief was, in my judgment, not only reasonable—it was correct. The fact is that no one, other than the dishonest lawyers, was injured by respondent's conduct. The courts were promptly informed. One case was reinstated, and the other could have been. And respondent created a substantial and obviously needed deterrent to similar misconduct by other attorneys.

I should make clear that I abhor the thought of intentionally deceiving a judge—even temporarily—by the

presentation of false testimony. But I abhor even more those members of my profession who seek to prostitute our courts. Since corrupt lawyers will not make payment of the bribe until that which they seek has been done, and payment is, in my judgment, a practical necessity to conviction of the lawyer, some form of misrepresentation to the judge is required if the evidence of payment is to be secured. What was done here, much as I dislike it, seems to me preferable to informing the judge in advance, thereby making him a participant, or immunizing the corrupt lawyer from investigation and prosecution which, I fear, will inevitably result if respondent's conduct is held ethically impermissible.

In short, it is undisputed that respondent was a conscientious prosecutor dedicated to improving the administration of criminal justice. Both defendants and prosecutors benefited from his efforts as Professor Haddad's statement illustrates. At no time did respondent intend to permanently deceive anyone, and the necessary, temporary deception practiced upon the court was corrected immediately after it had served its purpose. No authority is cited by my colleagues indicating that the proscriptions in the disciplinary rules of fraud, misrepresentation, deceit and the use of false evidence were intended to embrace the factual situation involved here, and I agree with Dean Freedman and the hearing panel that they were not so intended.

While I believe respondent's conduct, motivated and circumscribed as it was, did not breach the disciplinary rules, for the reasons earlier noted I concur in respondent's discharge.

MR. JUSTICE RYAN joins in this concurrence.

MR. JUSTICE WARD took no part in the consideration or decision of this case.

MR. JUSTICE CLARK, dissenting:

The issue in this case is not, as respondent states in his brief, "Whether the courtroom is immunized by the Code of Professional Responsibility from the application of investigatory procedures that are otherwise lawful and ethical?" Nor is the issue, as respondent darkly hints, whether the majority of the Review Board, or for that matter, this court, is willing to give the State's Attorney the latitude necessary to the successful apprehension and prosecution of corrupt attorneys.[1] Rather, as I see it, a candid statement of the questions presented to this court would be as follows:

"Whether an attorney is guilty of conduct which tends to defeat the administration of justice, where, as an assistant State's Attorney, he learned of an apparent attempt by a defendant's attorney to suborn the perjury of a police officer; instructed the officer to commit perjury if necessary to obtain evidence of payment from the attorney; whereupon, the officer falsely informed the court that a key prosecution witness was unavailable; the charges against the defendant were dropped; the attorney paid $50 to the officer, in a washroom adjacent to the courtroom, and another assistant State's Attorney, pursuant to respondent's instructions, informed the court.

---

[1]*E.g.*, at page 31 of respondent's brief we find the following hyperbole: "The intimation of the Review Board is that Respondent should have done nothing once he learned of the respective schemes of Powell and Howard, or that he should have proceeded with evidence which he knew from past experience would be insufficient to constitute proof of bribery beyond a reasonable doubt. In no other investigative activity would this type of approach be urged upon the prosecutor. This is the approach to corruption on the part of lawyers that suggests that they are being treated more favorably and pursued less diligently than others suspected of criminal activity." (Footnotes omitted.)

of the foregoing; and where, in a separate incident, respondent learned that an attorney for a defendant charged with aggravated battery had offered a bribe to a police officer, to facilitate the attorney's strategy (which apparently involved charging the complaining witness with battery); and, through an assistant, directed the officer (A) to inform the attorney that the complaining witness had been persuaded to drop her charges against the defendant, and (B) falsely to inform the court that the complaining witness did not wish to appear and testify; whereupon, when the complaining witness did appear at the courthouse on the day of trial, respondent's assistant concealed that witness from the court; the officer falsely testified under oath that the complaining witness and her mother did not wish to prosecute; the court granted the State's motion to strike with leave to reinstate; defendant's attorney gave the officer $250; respondent's attorney advised the court of the foregoing circumstances; and the cause was reinstated."

In my opinion, the answer is yes.

Lawyers who cause or permit lies to be told to judges are guilty of conduct which tends to defeat the administration of justice, regardless of the motive of the lawyer and regardless of the immediate impact of the lie. That the respondent's sole apparent motive was to obtain evidence which he considered essential to the effective prosecution of corrupt attorneys therefore is not dispositive of the issues raised by this case. It is not within the province of any attorney, including one who represents the State, to determine whether the public interest requires the temporary deception of the court. That no prior case has addressed the precise form of deception practiced here is hardly exculpatory: If anything, the absence of such

authority indicates that prosecutors ordinarily do not consider it within their power to determine whether to deceive judges. Although several distinguished members of the bar have, on behalf of the respondent, sought to explain the necessity and propriety of respondent's conduct, I seriously doubt whether any of them would have, if faced with the choice, acted as did he, particularly as regards his failure to obtain prior judicial sanction for his conduct. Respondent borders on frivolity in arguing that to have sought such prior sanction would have been improper. At the very least, therefore, I find the respondent guilty of incredibly poor ethical judgment and deserving of censure.

We may assume, for the sake of argument, that the respondent in good faith believed that, to persuade a judge or jury to convict an attorney accused of bribery, attempted bribery, or solicitation of perjury, it was necessary to obtain and present evidence of the payment of money by the attorney to the person allegedly bribed or solicited. (But see, *e.g., United States v. Jacobs* (2d Cir. 1970), 431 F.2d 754, *cert. denied* (1971), 402 U.S. 950, 29 L. Ed. 2d 120, 91 S. Ct. 1613, 1634 (attorney convicted without money changing hands). *Cf.* also, *e.g., In re Goldstein* (1952), 411 Ill. 360, 366 (difference in standard of proof between criminal and disciplinary proceedings); accord, *e.g., Maryland State Bar Association, Inc. v. Frank* (1974), 272 Md. 528, 325 A.2d 718 (attorney acquitted but disbarred).) We may further assume, for the sake of argument, that the attorneys in question would have been unwilling to make the payments in question until they saw and heard evidence of the perjury and/or suppression of witnesses they had bargained for.

The question remains, however, why did the respondent not inform the court of the foregoing until his agents had played out their strategy and had lied to the court?

Respondent's answer apparently is that he believed that to have informed the court beforehand would have been "improper" because (1) it would have, somehow, "involved" the court in a law-enforcement function, and (2) it would have constituted an *"ex parte"* communication in violation of Disciplinary Rule 7—110(B) of the Code of Professional Responsibility. I find that answer incredible. To have been informed before, rather than after, the fact of the falsity of testimony to be offered in his courtroom would not have "involved" the court in a law-enforcement function any more than a judge who reviews the adequacy of a search warrant or the voluntariness of a confession is "involved" in a law-enforcement function. (It is not unheard of, however, for law-enforcement personnel involved in the "competitive enterprise of ferreting out crime" (*Johnson v. United States* (1948), 333 U.S. 10, 14, 92 L. Ed. 436, 440, 68 S. Ct. 367, 369) to prefer to avoid the prior scrutiny of their actions that the warrant requirement mandates, although we do not know whether respondent's true motive here was to avoid such prior scrutiny.) Especially here, however, where the rights of a criminal defendant (including the right to avoid unnecessary delay and prejudice to witnesses) also were at stake, it was the court's prerogative to know of this little courtroom drama in advance and to pass upon its propriety. To have made such a determination before the fact would hardly have been anything but a judicial function, *i.e.*, the review of executive decisions in an effort to protect the integrity of the criminal justice process, including the rights of the defendants. The respondent's contention that *he* protected the rights of the defendants is an inadmissible misreading of the proper allocation of responsibilities between the executive and the judiciary. (*Cf., e.g., United States v. Nixon* (1974), 418 U.S. 683, 703-09, 41 L. Ed. 2d 1039, 1061-64, 94 S. Ct. 3090, 3105-08; *United States v. United States District Court* (1972), 407 U.S. 297,

314-18, 32 L. Ed. 2d 752, 764-67, 92 S. Ct. 2125, 2135-37; *Nixon v. Sirica* (D.C. Cir. 1973), 487 F.2d 700, 711-18.) It simply was not sufficient for the respondent to confront the court, after the fact, with the completed deception, stating in effect: "I did it. I'm proud of it. What are you going to do about it?" Respondent apparently had no doubt about the integrity of the trial judges he deceived; he has offered the statements of one of them in his defense. Even if he had such doubts, he was not without alternative fora, as I indicate below.

Respondent's arguments regarding Illinois Code of Professional Responsibility Disciplinary Rule 7—110(B) (1970) also are without merit, in my opinion. Disciplinary Rule 7—110(B) provides as follows:

> "(B) In an adversary proceeding, a lawyer shall not communicate, or cause another to communicate, as to the merits of the cause with a judge or an official before whom the proceeding is pending, except:
>
> (1) In the course of official proceedings in the cause.
>
> (2) In writing if he promptly delivers a copy of the writing to opposing counsel or to the adverse party if he is not represented by a lawyer.
>
> (3) Orally upon adequate notice to opposing counsel or to the adverse party if he is not represented by a lawyer.
>
> (4) As otherwise authorized by law."

First, I am not persuaded that the communication in question even falls within the letter of the rule, let alone its intent, because I am not persuaded that advising the court of a proposed strategy for apprehending opposing counsel in the act of bribery is "as to the merits of the cause." Second, paragraph (B)(4) of the rule expressly excepts *ex parte* communications "[a]s otherwise authorized by law." Respondent's statutory duties, which, he so emphatically claims, authorized him temporarily to deceive the court (despite the absence of any such express exemption in Disciplinary Rules 7—102(A) and 7—109),

would have provided substantial authority for the communication in question. It is just inconceivable to me that respondent could in good faith have believed that he could not, consistent with the intent of the Code, tell the court the truth, but he could cause the court to be told a lie. The purpose of Disciplinary Rule 7—110(B) is to prevent the "effect or *** the appearance of granting undue advantage to one party" (ABA Code of Professional Responsibility, Ethical Consideration 7—35 (1970)). Since respondent apparently concedes the need to inform the court of its deception after the fact, it is hard to see how prior warning would have given even the appearance of undue advantage to the State. If anything, it might have helped to preserve the rights of the defendant. It is not inconceivable that the court, thus warned, would have secretly appointed special counsel to represent the defendant's interests in this matter in an emergency, *in camera* hearing. The actions of the respondent effectively foreclosed this possibility too, however.

Finally, even if the respondent had in good faith believed that, for some as yet unarticulated reason, he could not talk to the trial judge, he should not have taken it upon himself to decide whether the temporary deception of the trial judge was appropriate. He should have had the common sense and ethical circumspection to have brought his dilemma to the attention of the presiding judge of the criminal division, or the chief judge of the circuit court, or if the foregoing were for some reason inappropriate, to this court itself, which has supervisory powers over the circuit courts. He did not do so; he thus usurped the role of the courts through deceiving a trial judge, albeit temporarily, and his conduct merits censure.

MR. JUSTICE MORAN, also dissenting:

I agree with the rationale of the lead opinion, dissent from its decision that no discipline should be imposed, and

am diametrically opposed to the totality of the joint special concurrence.

Respondent's conduct was, by his own admission, a violation of the disciplinary rules cited. To excuse his conduct because a conviction for bribery would otherwise be impossible would make the court not only a victim of respondent's duplicity but also an advocate of the philosophy that a conviction by any means is the ultimate goal of our system of justice.

That respondent might be excused because his motives were pure is an untenable defense, particularly when intent is not an element of the charge here raised against him.

Without dwelling on my many differences with the concurring decision, it will suffice to say that, in my opinion, it not only condones respondent's conduct but also lauds him for it and encourages it in others. Under the more palatable term "necessary," it avoids stating its assention to the cliche that the end justifies the means. The concurrence finds a cure in respondent's admission after the fact, yet confession does not eradicate the commission. In my view, the concurrence sets an intolerably dangerous precedent.

While we must avoid the temptation of imposing idealistic but unrealistically high expectations on members of the profession merely because of that membership, we cannot content ourselves to expect less of the practitioner than that he be subject to the rules of conduct imposed on all citizens. Even without the criteria of the disciplinary rules, the public, the court and the profession have the right, minimally, to expect a valid, common-sense determination by the practitioner to discern right from wrong, and one need not be trained in the law to know that it is flatly unacceptable to prevaricate to or mislead the court or to be instrumental in encouraging others to do so. The lead opinion finds ameliorating the fact that respondent acted without the guidance of precedent or settled

opinion. I am not so persuaded. The canopy of ethics must cover more than black-letter law or we are constrained to excuse all but those infractions so recorded, although it would be impossible to conceive of, much less enumerate, explicitly, every infraction possible.

Respondent's conduct is of the genre which has undermined the public's confidence in the profession, in the courts and, ultimately, in the law. If the public finds it intolerable that a member of the profession can operate without the constraints of law, it can be no less intolerable to the court affronted by the conduct. The court must remain the ultimate forum of truth. Respondent's conduct has disregarded that essential, and, in so critical a consideration, I do not believe that the court can condemn the act but excuse the actor. Under the mitigating circumstances of this case, I feel respondent should be censured.