**The PEOPLE of the State of Colorado, Complainant,**

v.

**Mark C. PAUTLER, Respondent.**

**No. 00PDJ016.**

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

April 2, 2001.

Opinion by Presiding Disciplinary Judge ROGER L. KEITHLEY and Hearing Board members, EDWIN S. KAHN and LINDA S. KATO, both members of the bar.

## OPINION AND ORDER IMPOSING SANCTIONS

*SANCTION IMPOSED:* **ATTORNEY SUSPENDED FOR THREE MONTHS, PERIOD OF SUSPENSION STAYED DURING A PROBATIONARY PERIOD OF TWELVE MONTHS**

The Complaint in this disciplinary action was filed February 24, 2000. The respondent, Mark C. Pautler, ("Pautler"), filed an Answer on March 23, 2000. On June 9, 2000, the People of the State of Colorado (the "People") filed a Motion for Summary Judgment with supporting documentation pursuant to C.R.C.P. 56. Pautler timely filed a Response to the motion with supporting documentation. The Presiding Disciplinary Judge ("PDJ") issued an Order on July 5, 2000 granting the Motion for Summary Judgment in part and denying it in part. The Order held that the undisputed facts established Pautler had engaged in conduct involving deceit and thereby violated The Colorado Rules of Professional Conduct ("Colo.RPC") 8.4(c) in connection with the events of July 8, 1998 surrounding the surrender of William "Cody" Neal ("Neal") to authorities in Jefferson County, Colorado, and granted summary judgment on the violation of Colo. RPC 8.4(c). The Order also held that there were insufficient facts set forth in the pleadings and supporting documentation to establish, before trial, a violation of Colo. RPC 4.3 and denied summary judgment as to that charge.[1]

---

1. Although the Order granting partial summary judgment stands apart from this decision, the issues raised in that motion and the facts and analysis supporting that decision are in accord

The trial of this matter occurred March 7, 8 and 9, 2001 before the PDJ and Hearing Board members, Edwin S. Kahn and Linda S. Kato, both members of the bar. The People were represented by Nancy L. Cohen, Deputy Attorney Regulation Counsel. Pautler was represented by William A. Tuthill, III, Assistant County Attorney for Jefferson County, Colorado. Prior to trial, the parties entered into numerous factual stipulations set forth in the Trial Management Order. At the commencement of trial the parties additionally stipulated that Neal was an unrepresented person at the time of the events in question in this case. The People called Mark C. Pautler, Jefferson County Public Defender James M. Aber and Daniel J. Sears as witnesses for the complainant. Pautler called Cheryl Zimmerman (a/k/a Cheryl Moore), Jefferson County District Attorney David Thomas, Denver District Attorney William Ritter, former Jefferson County Sheriff Ronald Beckman, Hon. Kim Goldberger, Douglas Moore, and Denver Manager of Safety Ari Zavaras as witnesses for the defense. Pautler also testified on his own behalf. The People's exhibits 1 through 6 and Pautler's exhibits A, B, C, D, F, G, H, I, J, R and T were admitted into evidence. Exhibits E and Q were offered and not admitted. Exhibit S was identified but not offered. Two complaining witnesses, Jeffrey S. Pagliuca and James M. Aber, made statements regarding the appropriate sanction pursuant to C.R.C.P. 251.18(a).

The PDJ and Hearing Board assessed the credibility of the witnesses, reviewed the exhibits admitted into evidence, considered argument of the parties, and made the following findings of fact which were established by clear and convincing evidence.

## I. FINDINGS OF FACT

Mark C. Pautler has taken and subscribed the oath of admission, was admitted to the bar of the Supreme Court of Colorado on May 19, 1975, and is registered on the official records of this court, registration number 06438. Pautler is subject to the jurisdiction of this court pursuant to C.R.C.P. 251.1(b).

On July 8, 1998, law enforcement authorities in Jefferson County, Colorado learned that an apartment in the southwest portion of the county contained three dead bodies. Three women, Rebecca Holberton, Candace Walters and Angela Fite, had been savagely killed with repeated blows from a wood-splitting maul. Not long thereafter, authorities learned that a fourth woman, JDY, had been lured to the crime scene prior to the killing of Fite, tied spread-eagled to eye bolts which Neal had installed in the floor, stripped and forced to watch Neal repeatedly cleave Fite's head and neck with the wood-splitting maul. After Neal killed Fite, he taunted JDY, placed a gun to her head and raped her. The next morning, Neal returned JDY to her apartment. Shortly thereafter, another woman arrived at the apartment and was taken hostage by Neal. Neal kept the two women at gunpoint in the apartment for thirty hours while he dictated the details of his crime spree into a recording machine. Neal allowed the two women to call a friend to come over to comfort them. When the friend arrived, he too was taken hostage. On the morning of July 8, 1998, Neal left the apartment, leaving his three hostages with explicit instructions to contact law enforcement and provide them with a pager number where he could be contacted.

At midday on July 8, at the request of a citizen, the Jefferson County Sheriff's Department conducted a welfare check at the apartment where the three murder victims were found. During the welfare check, the deputy sheriff located the bodies, alerted the Jefferson County District Attorney's Office and Pautler was assigned to the crime scene. Upon his arrival shortly after noon, Pautler peered into the apartment from the backyard, observed one exposed body taped to a chair and two wrapped objects which, he was informed, contained two additional female bodies. While waiting at the crime scene for the necessary search warrant, Pautler and a sheriff's officer decided to go to a nearby 7–Eleven to purchase soda drinks for the sheriff's department employees on the scene. Shortly after leaving the 7–Eleven, Pautler and the sheriff's officer were alerted that the

with the views of the Hearing Board and will be included within this decision.

three hostages Neal had released had contacted law enforcement and had information regarding the three murder victims. Pautler immediately went to the apartment of JDY where the three released hostages were being interviewed by law enforcement personnel.

Later that day, Deputy Sheriff Cheryl Zimmerman established phone contact with Neal from the apartment of JDY. Neal was using a cellular phone and, despite extensive efforts, law enforcement was unable to accurately determine Neal's location. Deputy Sheriff Zimmerman engaged in lengthy negotiations with Neal over a three and one-half hour period.

Deputy Sheriff Doug Moore and Pautler were present in the apartment during Deputy Sheriff Zimmerman's phone conversation with Neal. Deputy Sheriff Moore held a handheld dictation unit to an extension phone and recorded the phone call. Pautler observed the situation, read notes made by Deputy Sheriff Zimmerman, passed suggestions to her and, with another phone, kept others informed of events as they transpired.

During the course of the phone negotiations, Neal confessed to the three homicides, informed Deputy Sheriff Zimmerman he was armed, made statements which could be interpreted as threats to kill others, and made rambling comments about his work with the Central Intelligence Agency, the Federal Bureau of Investigation and the White House. Neal also made statements which could be interpreted as desiring to end the situation without harm to anyone else. Both Deputy Sheriff Zimmerman and Pautler perceived that Neal posed a significant risk of harm to members of the public.

At some point in the phone negotiations that night, Neal informed Deputy Sheriff Zimmerman that he wanted to surrender, but he wanted to talk to a lawyer first. Neal was not represented by counsel at the time of his request. Neal asked Deputy Sheriff Zimmerman to contact a lawyer named Daniel Plattner. Pautler was aware of Neal's desire to surrender and his request to talk to Plattner. Although Pautler thought Plattner had left the practice of law, he found his office phone number and, around midnight, tried to

call that number. A recording informed Pautler that the number was no longer in service. Pautler made no further attempts to contact Plattner. When informed that Plattner's phone was no longer in service, Neal asked to speak with a public defender before he surrendered. At Pautler's suggestion, Deputy Sheriff Zimmerman informed Neal that they were contacting the public defender. Notwithstanding Deputy Sheriff Zimmerman's representation to Neal, Pautler had no intention of contacting a public defender or any other defense lawyer. It was Pautler's belief at the time that any defense lawyer would advise Neal not to talk with law enforcement about his activities and Pautler wanted Neal to continue his dialogue. Pautler discussed with the sheriff's deputies whether another law enforcement officer could pose as a public defender. Deputy Sheriff Zimmerman perceived Neal as "bright" and feared that he might realize that the person he was speaking to was not a lawyer.

Pautler contacted his superior, District Attorney David Thomas, briefly summarized events and told Thomas that he planned to talk with Neal pretending to be a defense attorney to facilitate the surrender. Thomas expressed some reservation about the plan but deferred to Pautler's judgment because he was at the scene. Both Thomas and Pautler considered the situation to be very dangerous, believed the public to be at risk and thought extraordinary measures were required. Thomas told Pautler to do what he thought was necessary.

Pautler indicated to Deputy Sheriff Zimmerman that he would pose as a public defender but told her that she should use a different name to introduce him in order to conceal his true identity. Deputy Sheriff Zimmerman informed Neal that a public defender by the name of "Mark Palmer" had arrived, pretended to brief "Palmer" on the situation—including Neal's wish to speak to a lawyer prior to surrendering—and handed the phone to Pautler.

Pautler spoke with Neal by phone on two separate occasions the evening of July 8, 1998, both times pretending to be a public

defender. The entirety of those conversations is contained in exhibit 2 introduced at trial.[2]

At the time Pautler posed as a public defender, he intended to deceive Neal into believing that he was speaking to his lawyer. He knew that his deceptive conduct would be criticized by some and probably questioned by those enforcing the rules of professional conduct for attorneys. Pautler made a conscious choice to deceive Neal; he believed that the circumstances and attendant risk of Neal causing further harm to the public justified his conduct. In his judgment, the consequences of his deception were outweighed by Neal's surrender.

At no time during his conversations with Neal did Pautler disclose that he was actually a deputy district attorney nor did he make any attempt to clarify the misunderstanding which had been created by the planned deception. After Pautler impersonated the public defender, Neal once again spoke to Deputy Sheriff Zimmerman and another representative of the Sheriff's department. In addition, Neal was allowed to talk to a former acquaintance, a broadcast news journalist from one of the Denver television stations. Ultimately, Neal did surrender in accordance with the negotiations conducted by Deputy Sheriff Zimmerman without further incident.[3] Although Pautler was present at the surrender site, he neither met Neal nor made arrangements for a public defender to be present. Thereafter, Pautler did not inform Neal, the public defender nor anyone else outside the Jefferson County District Attorney's office of his deceptive actions on the night of July 8, 1998.

In the days following his surrender, when approached by the head of the public defender's office, Neal maintained that he was already represented by a public defender named Mark Palmer. Once Neal realized he

had been deceived by a lawyer from the district attorney's staff, the public defender perceived that Neal developed a distrust of lawyers—including the lawyers on the public defender's staff—and that perception, at least in part, affected subsequent judicial proceedings. Eventually, Neal discharged his public defender, represented himself on the three first-degree murder charges and pled guilty. At his subsequent death penalty proceeding, Neal insisted upon representing himself and was sentenced to death for his crimes.

At all times during the events in question Pautler was invested with the authority of a peace officer under § 18–1–901(3)($l$)(II)(A), 6 C.R.S. (1999). The facts elicited at trial, however, show that Pautler acted within his role as a lawyer and was not acting solely as a peace officer. His involvement was limited to observing the events as a representative of the district attorney's office, providing advice to the law enforcement officers and posing as a public defender.

With the exception of this event, Pautler enjoys a reputation as a lawyer of character and integrity, opinions which are shared by even those who originally filed requests for investigation against him in this case. Pautler was unequivocal in his testimony that given the same or similar circumstances he would make the same decisions again and engage in the same deceit which brought him before this tribunal.[4]

## II. CONCLUSIONS OF LAW

The Complaint charges Pautler with violating both Colo. RPC 8.4(c) and Colo. RPC 4.3.

Colo. RPC 8.4(c) provides:

It is professional misconduct for a lawyer to:

---

2. Of the three and one-half hours of recorded conversation with Neal, Pautler's two portions total less than seven and one-half minutes.

3. Review of these tape recordings reveal that Deputy Sheriff Zimmerman, through her calm and methodical negotiations, placed Neal at ease, convinced him to surrender and created an atmosphere in which Neal felt sufficiently safe to give himself up. If her overwhelming contribu-

tion to the safe and peaceful resolution of this situation has not been adequately recognized by others, we do so here.

4. Pautler did acknowledge in testimony following that of two elected district attorneys that were he to do it again, he would modify his past conduct to the extent of timely notifying the public defender of his communication with the defendant.

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

■ No exception to the prohibition contained in Colo. RPC 8.4(c) is found within the rules nor is any suggested within the explanatory commentary. After exhaustive research, not a single case has been discovered which recognizes an exception to the ethical principle that a lawyer may not engage in deceptive conduct. Neither the People nor Pautler has provided any such authority.

■ Pautler admits and the facts conclusively establish that he knowingly and intentionally engaged in conduct designed to deceive Neal into believing that he was represented by a public defender during negotiations structured to encourage Neal to surrender. Pautler admits and there can be no doubt that his conduct violates the plain wording of Colo. RPC 8.4(c).

■ Pautler contends, however, that the circumstances existing at the time of his conduct, namely, the fear that Neal might harm or kill others, the fact that law enforcement agents did not know Neal's location, and the particularly brutal nature of Neal's crimes, justified his actions and constituted a defense to the charges against him.[5] Pautler also contends that § 18–1–901(3)(*l*)(II)(A), 6 C.R.S. (1999) invests district attorneys with the status of peace officers and allows them to use deception in the exercise of that authority.

■ Although there is a substantial body of law that allows law enforcement personnel to use artifice and deceit in the exercise of their professional duties, the facts of this case reveal that Pautler was not acting as a peace officer when he attempted to deceive Neal; rather, he was acting within his role as a lawyer. See United States v. Russell, 411 U.S. 423, 436, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973)(holding that there are circumstances

when the use of deceit [by a law enforcement agent] is the only practical law enforcement technique available). Pautler's own testimony limits his participation in the events to observation, giving legal advice and acting as a consultant. He was not part of the investigative team but rather was their legal advisor.[6] Simply put, Pautler did not engage in the questioned conduct as a member of the investigative team exercising police authority but as an attorney. His conduct, therefore, must be tested against those rules of conduct applicable to all lawyers.

■ Pautler also argues that "justification" should be a defense to the professional misconduct charges advanced in the Complaint. Colorado Revised Statutes § 18–1–702, 6 (1999) (the "choice of evils" or "justification" defense), although derived from the common law doctrine of necessity, by its own terms does not apply outside the criminal law setting. Cf. People v. Strock, 623 P.2d 42, 44 (Colo.1981); People v. Robertson, 36 Colo. App. 367, 543 P.2d 533, 534 (Colo.App.1975).

Moreover, the Colorado Supreme Court has previously addressed the issue of justification as a defense to professional misconduct charges as raised in this case. In People v. Reichman, 819 P.2d 1035 (Colo.1991), Reichman, the District Attorney for La Plata County, filed a fictitious criminal complaint and other documents against an undercover police officer for the purpose of deceiving the court and others in an effort to rehabilitate the officer's undercover identity and operation. Eventually, Reichman was charged, in part, with violating DR 1–102(A)(4), the predecessor of Colo. RPC 8.4(c), set forth in the prior Colorado Code of Professional Responsibility. Relying upon In re Friedman, 76 Ill.2d 392, 30 Ill.Dec. 288, 392 N.E.2d 1333 (1979), the Supreme Court of Colorado specifically rejected the argument that justification provided a defense to professional

---

5. See 18–1–702, 6 C.R.S. (1999). Pautler does not contend that the "choice of evils" or "justification" defense set forth in the statute is directly applicable in attorney discipline cases; rather, he argues that if available as a defense to criminal conduct, "justification" should also excuse professional misconduct charges.

6. It is not necessary for this opinion to address whether someone acting solely as a peace officer who happens to hold a law license may engage in artifice and deceit in the exercise of their law enforcement duties and, accordingly, no ruling on that issue is intended by this decision. But See, United States v. Hammad, 858 F.2d 834, 839 (2d Cir.1988).

misconduct charges. The Supreme Court stated:

> Prosecutorial deception may not always constitute prosecutorial misconduct for purposes of determining whether a criminal complaint or indictment must be dismissed. It does not necessarily follow, however, that prosecutorial deception of a type which results in directly misleading a court should be exempted from the proscriptions of the Code of Professional Responsibility simply because the deception is not such as to warrant the dismissal of a criminal case. *Id.* at 1037, 30 Ill.Dec. 288, 392 N.E.2d 1333.[7]

Whether Pautler's deceptive conduct infected the fairness of the underlying criminal proceeding against Neal is not before this court. That determination is for another forum. For purposes of deciding whether Pautler violated Colo. RPC 8.4(c), it is not relevant. It is the conduct of the lawyer which dictates whether there is a *violation* of The Rules of Professional Conduct, not the effect of that conduct or the person or entity to which the conduct is directed.[8]

Although the surrender of Neal was a goal with which all reasonable persons would agree under the circumstances in which Pautler found himself on the evening of July 8, 1998, the means by which that goal might be achieved are subject to scrutiny. In *Reichman*, the Supreme Court, when faced with the necessity to exercise similar scrutiny, stated:

> This court has spoken out strongly against misconduct by public officials who are lawyers .... [t]he respondent's responsibility to enforce the laws in his judicial district grants him no license to ignore those laws or the Code of Professional Responsibility. While the respondent's motives and the

erroneous belief of other public prosecutors that the respondent's conduct was ethical do not excuse these violations of the Code of Professional Responsibility, they are mitigating factors to be taken into account in assessing the appropriate discipline.

*Id.* at 1038.[9]

Prosecutors, who are enforcers of the law, have higher ethical duties than other lawyers because they are ministers of justice, not just advocates. *Reichman*, 819 P.2d at 1038; *see also* Comment to Colo. RPC 3.8. They must be forever vigilant that their conduct as attorneys not only meets the minimum standards of conduct set forth in The Rules of Professional Conduct but they must strive to exceed those requirements. They must also carefully carry out their duty to protect the public in the exercise of their prosecutorial responsibilities while maintaining the duties and responsibilities of professional conduct imposed upon them by The Rules of Professional Conduct. They may not choose to satisfy the former at the expense of the latter.

*Reichman* does not stand alone in holding prosecutors to a higher ethical standard. Other courts which have addressed professional misconduct by prosecutors have uniformly recognized that the rules of professional conduct impose higher ethical standards upon prosecutors than other lawyers. In the matter of *In re Doe*, 801 F.Supp. 478, 479–480 (D.N.M.1992), the court reasoned:

> Acknowledging the crucial role of the lawyer in our nation's fabric, we must understand ethical standards are not merely a guide for the lawyer's conduct, but are an integral part of the administration of justice. Recognizing a Government lawyer's

---

7. Although the facts in *Reichman* reveal that the attorney deceived a court, the basis of the Court's conclusion that he engaged in ethical misconduct is premised upon the deceit, not the party deceived.

8. Once a violation is determined, however, the effect of the misconduct may become relevant in determining the appropriate sanction to be imposed.

9. Both Illinois and New York courts have reached similar conclusions regarding the availability of the defense of "justification" to alleged violations of the rules of professional conduct. *See In Re Malone*, 105 A.D.2d 455, 480 N.Y.S.2d 603, 607 (1984); *In Re Friedman*, 76 Ill.2d 392, 30 Ill.Dec. 288, 392 N.E.2d 1333, 1335 (1979). *But Cf. Trammell v. Disciplinary Board of the Alabama State Bar*, 431 So.2d 1168, 1170 (Ala. 1983); *Montag v. State Bar*, 32 Cal.3d 721, 186 Cal.Rptr. 894, 652 P.2d 1370, 1371 (1982).

role as a shepherd of justice, we must not forget that the authority of the Government lawyer does not arise from any right of the Government, but from power entrusted to the Government. When a government lawyer, with enormous resources at his or her disposal, abuses this power and ignores ethical standards, he or she not only undermines the public trust, but inflicts damage beyond calculation to our system of justice. This alone compels the responsible and ethical exercise of this power.

The second circuit in *United States v. Hammad*, 858 F.2d 834, 839 (2d Cir.1988), when faced with similar issues under the Code of Professional Responsibility, stated:

> [T]he Constitution prescribes a floor below which protections may not fall, rather than a ceiling beyond which they may not rise. The Model Code of Professional Responsibility, on the other hand, encompasses the attorney's duty "to maintain the highest standards of ethical conduct." Preamble, Model Code of Professional Responsibility (1981). The Code is designed to safeguard the integrity of the profession and preserve public confidence in our system of justice. It not only delineates an attorney's duties to the court, but defines his relationship with his client and adverse parties. Hence, the Code secures protections not contemplated by the Constitution.

In support of his position in this case, Pautler has referred to two sentences extracted from the Preamble and Scope of The Rules of Professional Conduct. The first states, "[h]owever, a lawyer is also guided by personal conscience and the approbation of his peers." *Preamble: A Lawyer's Responsibilities, The Colorado Rules of Professional Conduct.* The second reads: "The Rules of Professional Conduct are rules of reason." *Scope.* These two sentences, as relied upon by Pautler, are taken out of context. The Preamble further provides:

> Lawyers, as guardians of the law, play a vital role in the preservation of society. The fulfillment of this role *requires* an understanding by lawyers of their relationship with and function in our legal system. A consequent obligation of lawyers is to

maintain the highest standards of ethical conduct (emphasis added).

As negotiator, a lawyer seeks a result advantageous to the client but consistent with requirements of *honest dealing* with others. *Id.* (emphasis added).

In the nature of law practice, however, conflicting responsibilities are encountered. Virtually all difficult ethical problems arise from conflict between a lawyer's responsibilities to clients, to the legal system and to the lawyer's own interest in remaining an upright person while earning a living. The Rules of Professional Conduct *prescribe* terms for resolving such conflicts. *Within* the framework of these Rules many difficult issues of professional discretion can arise. Such issues *must* be resolved through the exercise of sensitive professional and moral judgment guided by the basic principles underlying the Rules (emphasis added). *Id.*

The *Scope* further states:

> The Rules of Professional Conduct are rules of reason. They should be interpreted with reference to the purposes of legal representations and of the law itself. *Some of the Rules are imperative, cast in the terms "shall" or "shall not."* These define proper conduct for purposes of professional discipline. Others, generally cast in the term "may," are permissive and define areas under the Rules in which a lawyer has professional discretion. *Id.* (emphasis added).

 Both of the rules under which Pautler was charged are imperative, not permissive in application. Compliance with their mandatory provisions is required and is not subject to the exercise of discretion by the lawyer. When conflicts between duties arise the rules *prescribe* the manner of their resolution *within* their framework. Pautler chose to go outside the framework of those imperative rules. If it is not yet clear, The Rules of Professional Conduct mandate that lawyers may not, can not and must not engage in conduct involving deceit. The ends do not justify the means. Justification does not present a defense to an alleged violation

of Colo. RPC 8.4(c) or Colo. RPC 4.3.[10] To the extent evidence of justification, or motive, may be considered at all in a disciplinary proceeding against an attorney, it is limited to a consideration of mitigation for the misconduct undertaken.

Having concluded that justification does not provide a defense to the alleged violation of Colo. RPC 8.4(c) or Colo. 4.3, it is an inescapable conclusion that Pautler's knowing and intentional actions to deceive Neal into believing that Pautler was a public defender representing Neal's interests violated Colo. RPC 8.4(c).

■ The Complaint in this action also charges that Pautler's conduct violated Colo. RPC 4.3.

Colo. RPC 4.3 provides:

In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall state that the lawyer is representing a client and shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding. The lawyer shall not give advice to the unrepresented person other than to secure counsel.

■ The elements of Colo. RPC 4.3 differ from those required by Colo. RPC 8.4(c). The application of Colo. RPC 8.4(c) is broad and prohibits deceptive conduct by attorneys in both professional and nonprofessional situations. Colo. RPC 4.3 on the other hand is more limited.[11] It only applies to those professional situations in which an attorney comes into contact with others while representing a client. Its specific application is intended to prohibit a lawyer from misleading an unrepresented person about the lawyer's role in a matter. *See, e.g., In re Faraone,* 722 A.2d 1, 2 (Del.1998)(suspending attorney for six months for failing to correct an unrepresented third party's misapprehension about whom the lawyer represented); *In re Air Crash Disaster Near Roselawn,* 909 F.Supp. 1116, 1123 (N.D.Ill.1995)(plaintiff's lawyer violated Rule 4.3 by sending letter and questionnaire to defendant's pilots, purporting that material was an "independent survey."). The rule does not proscribe contact with unrepresented persons, it merely prohibits a lawyer from misrepresenting his role.[12]

■ The American Bar Association Model Rule 4.3, from which Colo. RPC 4.3 is patterned, does not place an affirmative obligation upon the lawyer to disclose that he represents a client in connection with the subject matter of the contact. Rather, it merely places the burden upon the lawyer to make no statements or otherwise imply that the lawyer is disinterested. In contrast, Colo. RPC 4.3 is more expansive and places additional obligations upon a lawyer. Under Colorado's rule, not only must the lawyer refrain from stating or implying that he is a disinterested party, he must take the affirmative step of informing the third party that

**10.** Although Pautler argued "justification" in defense of his conduct, he also characterized the circumstances in which he made his decision to deceive as comparable to duress. Duress suggests factual circumstances in which one's ability to evaluate and reason are affected by external factors. The evidence presented in this case does not suggest that Pautler's ability to accurately evaluate the circumstances or apply informed reason were affected by events. Indeed, the PDJ and Hearing Board conclude elsewhere in this Opinion that his conduct was both knowing and intentional.

**11.** The applicability of Colo. RPC 4.3 is most apparent when a lawyer interviews a witness having information relevant to his client's cause.

**12.** Pautler argued that the exceptions recognized by some jurisdictions to the coverage of rules comparable to Colo. RPC 4.2 should be engrafted onto Colo. RPC 4.3. *See* Colorado Bar Association Ethics Committee Opinion, Formal Op. 65 (1994)(discussing *ex parte* communications with represented persons during criminal and civil regulatory investigations and proceedings and analyzing former DR7–104 and Colo. RPC 4.2). Those exceptions interpret the communication with represented persons to be not applicable to investigative proceedings which predate either arrest or indictment. Pautler's reliance upon those decisions are misplaced. The exceptions recognized in those decisions arise from the specific wording of comparable rules that the represented person must be a "party," thereby only applying after formal charges are filed. No such limiting wording is found in Colo. RPC 4.3.

he represents a client in connection with the subject matter of the contact. This additional measure of protection is designed to insure that the third party with whom the lawyer is communicating is fully aware of the lawyer's role and can respond to his inquires or comments with a full understanding that the lawyer is not a neutral participant.

Pautler's misconduct in this case falls squarely within the type of conduct Colo. RPC 4.3 was intended to prevent. Pautler's involvement in these events arose solely because he was a deputy district attorney. His role was to observe events as they transpired, to monitor the integrity of the criminal investigation and to render legal advice regarding that integrity. He did so on behalf of his client, the People of the State of Colorado. He was not a neutral, disinterested participant.

Consequently, when he chose to speak with Neal it was incumbent upon Pautler to inform Neal that he represented the People. Moreover, Colo. RPC 4.3 required Pautler to take reasonable steps to correct the misunderstanding which he knew had been created at his instigation regarding his role. Pautler failed to comply with either requirement. To do so would have revealed the deception in which he was an active participant. That is precisely the type of professional misconduct Colo. RPC 4.3 is designed to prevent. Pautler's conduct violated Colo. RPC 4.3.

### III. SANCTION/IMPOSITION OF DISCIPLINE

■ "The purpose of lawyer discipline proceedings [and the imposition of discipline against a lawyer who has engaged in misconduct] is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely properly to discharge their professional duties." ABA *Standards for Imposing Lawyer Sanctions*, (1991 & Supp.1992)("ABA *Standards*"); *See also* C.R.C.P. 251.1(a). The public and the profession quite properly

expect that anyone who is admitted to the practice of law will conform their conduct to the minimal standards of the profession. The administration of justice requires it.[13]

■ In arriving at the appropriate discipline to be imposed, consideration should be given to the duty violated, the lawyer's mental state, the injury, whether actual or potential, caused by the lawyer's misconduct and the existence of aggravating or mitigating factors which could enhance or diminish the presumptive sanction. ABA *Standards, II., Theoretical Framework*.

■ Pautler's misconduct violated duties owed to the legal system, the profession and the public. At the time of his misconduct Pautler knew that his planned course of deception was inconsistent with The Rules of Professional Conduct, knew that his action would likely be questioned by those charged with enforcing compliance with the rules, and made a conscious choice to engage in the deceptive conduct. Moreover, Pautler knew that his chosen course of deception carried with it the very real risk of potentially serious injury to the public. Pautler knew that if his deception were discovered by Neal, it was reasonably foreseeable that all of the negotiating gains made by Deputy Sheriff Zimmerman might be lost, Neal could terminate communication and resume or escalate his murderous crime spree. Pautler's state of mind was not only knowing, it was intentional.

The injury which arose as a direct result of Pautler's misconduct is both actual and potential. Pautler's misconduct caused actual harm to the administration of justice. The evidence established that Pautler's misconduct, at least in part, contributed to a perceived lack of trust between Neal and his lawyers, adversely impacted subsequent judicial proceedings and resulted in additional hearings to explore factual and legal issues created by the deceptive conduct. Although the evidence in this proceeding is not sufficient to accurately quantify the degree or

---

13. C.R.C.P. 251.1(a) provides in part:: "A license to practice law is a proclamation by this Court that its holder is a person to whom members of the public may entrust their legal affairs with confidence; that the attorney will be true to that trust; that the attorney will hold inviolate the confidences of clients; and that the attorney will competently fulfill the responsibilities owed to clients and to the courts."

extent of the actual harm caused by Pautler's deceit upon the criminal proceeding, the evidence is sufficient to conclude that there was some measure of harm caused to the administration of justice.

The potential injury caused by Pautler's choice to engage in deception is even greater and must be considered to be serious. The People argued during closing argument in this case that Pautler actually became Neal's attorney as a result of the conversations with him. The consequences that flow from that argument may be extremely serious. Although there is substantial support in the factual record and legal authority in the case law in this jurisdiction to advance that contention, it is not necessary that we reach that conclusion in arriving at our decision in this matter. *See People v. Bennett,* 810 P.2d 661, 664 (Colo.1991)(stating that the test in determining the existence of an attorney/client relationship is a subjective one and an important factor is whether the client believed that the relationship existed, *citing In re Petrie,* 154 Ariz. 295, 742 P.2d 796, 800–01 (1987)). However, the fact that the question can be legitimately raised is sufficient to conclude that Pautler's misconduct holds the potential for causing serious injury to the administration of justice in the Neal case.

■ Arriving at an appropriate sanction for Pautler's misconduct, in light of his mental state and the injury arising from it, is difficult. The sanction imposed must recognize the severity of the misconduct, the injury or potential injury resulting from the misconduct, and whether prosecutors should have been on notice that the conduct was improper.[14] *See People v. Mucklow,* 35 P.3d 527, 539 (Colo. PDJ 2000) 30 Colo. Law 115, 120 (February 2001)(holding that a period of suspension would be warranted for a prosecutor's failure to timely disclose exculpatory information in violation of Colo. RPC 3.8(d) on two separate occasions but determining that a public censure was warranted recognizing that no prior Colorado cases gave

guidance to the inexperienced attorney); *People v. Brown,* 726 P.2d 638, 642 (Colo.1986)(disbarring District Attorney for the First Judicial District for engaging in dishonesty and conduct adversely reflecting upon his fitness to practice law by requesting that an employee from the Department of Motor Vehicles remove some points from the attorney's driving record for insurance reasons); *In the Matter of Howes,* 123 N.M. 311, 940 P.2d 159, 171 (1997)(publicly censuring the assistant United States Attorney who violated the rule prohibiting contact with a represented party without the party's attorney being present); *In the Matter of John Matthew Chancey,* No. 91CH348, slip op. at 17(Report of Review Board of the Illinois Attorney Registration and Disciplinary Commission April 21, 1994)(imposing a public reprimand after finding a violation of DR1–102(a)(4) prohibiting deceit and dishonesty where the assistant state's attorney, an experienced prosecutor, prepared and delivered to another person a false document appearing to be a court order, and failing to disclose what he had done to any member of the court where attorney's motivation to engage in deceit was the safety of a young girl apprehended by her father); *Committee on Professional Ethics v. Ramey,* 512 N.W.2d 569, 572 (Iowa 1994)(indefinitely suspending prosecutor for failing to disclose police reports to the defense by arguing that the reports were not material and making a material misrepresentation to the court concerning evidence); *Office of Disciplinary Counsel v. Jones,* No. 92–32, slip op. at 4–6 (Ohio Misc. Dec. 4, 1992), 66 Ohio St.3d 369, 613 N.E.2d 178, 178 (1993)(suspending the prosecutor for six months for knowingly failing to disclose during the course of a trial the existence of evidence that tended to negate guilt, mitigate the degree of the offense or reduce the punishment); *Cuyahoga County Bar Association v. Gerstenslager,* 45 Ohio St.3d 88, 543 N.E.2d 491, 491 (1989)(publicly reprimanding assistant county prosecutor for neg-

**14.** *See generally,* Richard A. Rosen, *Disciplinary Sanctions Against Prosecutors for Brady Violations: A Paper Tiger,* 65 N.C.L.Rev. 693, 730–731 (1987); John M. Burkoff, *Prosecutorial Ethics: The Duty Not "To Strike Foul Blows,"* 53 U.Pitt. L.Rev. 271 (1992); Fred C. Zacharias, Bruce A.

Green, *The Uniqueness of Federal Prosecutors,* 88 Geo. L.J. 207 (2000); Lisa F. Salvatore, *United States v. Hammad: Encouraging Ethical Conduct of Prosecutors During Pre–Indictment Investigations,* 56 Brok. L.Rev. 577(1988).

ligently failing to provide full disclosure of exculpatory information); *In the Matter of Zapf*, 126 Wis.2d 123, 375 N.W.2d 654, 655 (1985)(publicly reprimanding district attorney for failing to disclose discoverable material in the course of a criminal trial); *In the Matter of Malone*, 105 A.D.2d 455, 460, 480 N.Y.S.2d 603 (N.Y.App.Div.1984)(publicly censuring the Inspector General of the New York State Department of Correctional Services for counseling and instructing a witness to give contradictory, misleading and inconsistent testimony and attempting to mislead and deceive a party or parties in the interest of protecting the witness where the case was of first impression in the state); *Trammell v. Disciplinary Board of the Alabama State Bar*, 431 So.2d 1168, 1173 (Ala.1983)(disbarring former district attorney for accepting money to bribe a member of the Alabama Board of Pardons and Paroles and involvement in scheme to purchase paroles for inmates); *People v. Green*, 405 Mich. 273, 274 N.W.2d 448, 456 (1979)(holding that assistant prosecuting attorney violated DR 7–104(A)(1) [the precursor to Rule 4.2] by listening to voluntary statements made by the defendant in a first-degree murder case without requiring that defendant's counsel be present); *In re Friedman*, 76 Ill.2d 392, 30 Ill.Dec. 288, 392 N.E.2d 1333, 1336 (1979)(finding that respondent attorney violated the Illinois rules of professional conduct prohibiting deceit, creation of and knowing use of false evidence and secreting of a witness but declining to impose a sanction on the grounds that respondent acted without the guidance of precedent or settled opinion in that jurisdiction).

Colorado precedent suggests that a sanction of suspension is warranted. *See People v. Brooks*, No. 01PDJ008 (Colo. PDJ March 13, 2001) 30 Colo. Law. ___ ( ___, 2001)(PDJ approving conditional admission of misconduct suspending attorney for nine months where attorney engaged in deceit during questioning by sheriff's investigators regarding investigation of criminal matter); *In re Gibson*, 991 P.2d 277, 279 (Colo.1999)(attorney suspended for thirty days in case with significant mitigating factors where attorney neglected a client's per-

sonal injury case and misrepresented the status of the case to client for four years to cover up his neglect); *In Re Myers*, 981 P.2d 143, 145 (Colo.1999)(suspending attorney for ninety days for misconduct toward complaining witnesses in a theft case, professing not to represent the defendant, telling a complainant that she would use a non-existent criminal record against him if the case went to trial, and telling the complainant that he was as guilty as the defendant because he signed a confession without indicating that he was a witness); *In re Bobbitt*, 980 P.2d 538, 540 (Colo.1999)(criminal defense attorney suspended for one year and one day for failing in two separate appeals to file opening brief, causing dismissal of client's appeals, and misrepresenting to trial court the reasons for client's failure to appear at sentencing hearings); *In re Porter*, 980 P.2d 536, 538 (Colo.1999)(attorney suspended for forty-five days for making misrepresentations to trial court and disciplinary investigator regarding certificate for review for client's action against lawyers for client's wife in marriage dissolution action, and whose failure to timely file the certificate caused client to lose the underlying action); *People v. Mitchell*, 969 P.2d 662, 666 (Colo.1998)(attorney suspended for one year and one day for misrepresentations in applications for liquor license and Small Business Administration loan that a woman owned the majority of stock in a corporation); *People v. Field*, 944 P.2d 1252, 1257 (Colo.1997)(attorney suspended for six months for engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation when he stated falsely to client and client's wife that motion to seal criminal records had been filed, that he was waiting to hear from court, and that court date had been scheduled); *People v. Kearns*, 843 P.2d 1, 4–5 (Colo.1992)(suspending lawyer for one year and one day for inducing a loan through misrepresentations and assigning loan proceeds without lender's consent or knowledge).

These decisions reveal that sanctions imposed against prosecutors who engage in deceitful conduct range from no sanction where the misconduct is minor and there is no prior precedent to disbarment where the conduct

is serious and precedent had informed the prosecutor that the conduct is improper.

Disciplinary decisions imposing sanctions against lawyers who are not prosecutors for deceitful conduct are more prevalent. *See Florida Bar v. Feinberg,* 760 So.2d 933, 940 (Fla.2000)(assistant state attorney publicly reprimanded "under the unusual circumstances of this case" where, but for the circumstances, a more serious sanction would be imposed where the prosecutor met with the defendant without notifying defendant's counsel and was untruthful in discussions with an attorney regarding his meeting with that attorney's client. The court stated "[t]ruth is critical in the operation of our judicial system and we find such affirmative misrepresentations by any attorney, but especially one who represents the State of Florida, to be disturbing. Feinberg's actions, although generated by good intentions, developed into serious violations which cast a shadow over the integrity of our adversarial system."); *Florida Bar v. Schaub,* 618 So.2d 202, 204 (Fla.1993)(suspending the prosecutor for thirty days for prosecutorial misconduct which led to the admission of irrelevant and deliberately misleading evidence). Precedent involving deceptive conduct, whether by prosecutors or non-prosecutors, suggests that the presumptive sanction is suspension from the practice of law.

The ABA *Standards* provide guiding authority for selecting the appropriate sanction to impose for lawyer misconduct. ABA *Standard* § 5.22, which applies to misconduct by lawyers who serve as public officials, provides:

> Suspension is generally appropriate when a lawyer in an official or governmental position knowingly fails to follow proper procedures or rules, and causes injury or potential injury to a party or to the integrity of the legal process.

Pautler's misconduct meets or exceeds every requirement set forth in § 5.22. ABA *Standard* § 7.2 which applies to all lawyers who violate duties to the profession, provides:

> Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential

injury to a client, the public, or the legal system.

As with § 5.22, Pautler's misconduct meets or exceeds the requirements of § 7.2. Other provisions of the ABA *Standards* having less direct applicability also suggest that suspension is the presumptive discipline for misconduct such as that which occurred in this case. *See* ABA *Standards,* § 6.22, § 6.32.

██ Both the applicable case authority and the ABA *Standards* suggest and we find that the presumptive sanction for prosecutorial deception is suspension from the practice of law. In considering the effect of the mitigation and aggravation in this case on the presumptive sanction, the PDJ and Hearing Board were particularly mindful of the guidance set forth in *Reichman, supra.*

The most important mitigating factor tending to reduce the sanction to be imposed against Pautler was his motive for engaging in the misconduct. Prior to the time this case was formally filed, the People admitted that Pautler's motive to engage in the conduct was to secure the surrender of Neal. Pautler reasserted that motive in testimony in this case. There can be no doubt that apprehending Neal and thereby removing any risk he might pose to others, whether real or suspected, is neither selfish nor dishonest. Indeed it is a motive shared by all. Both the ABA *Standards* and *Reichman, supra,* acknowledge that the absence of a dishonest or selfish motive is a factor to be considered in deciding the appropriate sanction. ABA *Standards,* § 9.32(b).

Just as the absence of a dishonest or selfish motive may be a mitigating factor, the existence of a selfish or dishonest motive may be an aggravating factor. ABA *Standard,* § 9.22(b). In this case, Pautler had more than a single motive driving his misconduct. Pautler's deception was focused not only on getting Neal to surrender and protecting innocent citizens but also to accomplish the surrender of Neal in such a fashion as to keep Neal talking about his crimes without the benefit of requested legal representation and thereby gain an advantage in subsequent legal proceedings. This secondary motive is supported by Pautler's testimo-

ny at trial that he feared that any defense attorney who might be enlisted in response to Neal's request would tell Neal to stop talking, and by the fact that Pautler did not immediately disclose his actions to Neal's public defender once appointed. *Id.* at § 9.22(j)(considering attorney's failure to rectify misconduct as an aggravating factor). Rather, Pautler said nothing about his deceit. He allowed the public defender's confusion about the existence and whereabouts of "Mark Palmer" to continue and interfere with the commencement of meaningful representation of Neal. Pautler waited until the public defender discovered his misconduct while reviewing discovery materials some two weeks after the event. This second motive driving Pautler's misconduct, under the circumstances, was selfish and is an aggravating factor which must be considered. *Id.* at § 9.22(b).

Pautler has no prior disciplinary record, *id.* at § 9.32(a), and provided full and free disclosure to the Office of Attorney Regulation Counsel during the pendency of this matter, *id.* at § 9.32(e), both mitigating factors. However, Pautler had substantial experience in the practice of law prior to these events, *id.* at § 9.22(i), an additional aggravating factor.

There exists one additional aggravating factor of significant consequence. Pautler testified that given the same or similar circumstances again, he would make the same decisions and engage in the same deceitful misconduct. He gave that testimony with a substantial measure of conviction. By doing so, Pautler evidenced a failure to recognize or even acknowledge the improper conduct in which he engaged, *id.* at § 9.22(g). That failure is particularly significant in this case.

Since 1991, when the decision in *Reichman* was issued, prosecutors have known that deception is not justified by motive, no matter how lofty. The law had been unmistakable for nearly seven years at the time of Pautler's misconduct that deception by a prosecutor is not acceptable and will not be tolerated in Colorado.

Pautler knew the law and, notwithstanding that knowledge, consciously chose to breach the rules by which all lawyers are bound.

Moreover, he made it clear he would do it again. And therein lies the problem. Neither this court, the profession nor the public can have any clear understanding of when Pautler may again choose to ignore the Rules for some greater good as he perceives it to be.

Pautler interprets The Rules of Professional Conduct to be ethical guidelines applicable to his professional conduct unless, in his judgment, circumstances dictate conduct at variance with those Rules to achieve what he perceives to be a desirable end. Such an interpretation reduces The Rules of Professional Conduct to meaningless expressions of aspirational goals forever subject to the situational whims of lawyers seeking to do the right thing as they then see it. Once the door of "justifiable deception" is opened, it takes little imagination to speculate about conduct which could result: by other prosecutors in the pursuit of justice, defense counsel in the zealous advocacy of their client's cause, domestic relations counsel in the protection of their client's abused children, and even commercial counsel in the protection of assets of their corporate client. Pautler's interpretation reflects a fundamental misunderstanding of his role within the legal system, the purpose of the Rules and his obligation to conform his conduct to their mandate. That misunderstanding poses a continuing threat to the legal system, the profession and the public.

The PDJ and Hearing Board, after having weighed the relative strengths of the mitigating factors and aggravating factors, conclude that the mitigating factors outweigh the aggravating factors. However, in light of Pautler's misunderstanding of The Rules of Professional Conduct and his role as an integral part of the legal system, the weight of the mitigating factors is not sufficient to deviate from the presumptive sanction of suspension.

### Dissent by LINDA S. KATO:

I respectfully dissent. The sanction imposed is not appropriate for the conduct at issue, and is not comparable to other cases involving similar violations.

### I. Pautler's Motive

As established by the majority opinion, Pautler was motivated to deceive Neal by a concern for public safety and the urgent need to bring Neal into custody. The majority also finds that Pautler had a "secondary motive," that is, to keep Neal talking about his crimes without benefit of counsel and thereby gain an advantage in subsequent legal proceedings. I do not find evidence that would support this conclusion.

Pautler did indeed testify that he feared that a defense attorney, if called to the scene, would advise Neal to stop talking to the sheriffs. Deputy Sheriff Zimmerman testified to having the same fear, because she felt it crucial that the officers maintain communication with Neal as long as possible until he was apprehended. Their belief was not without grounds. Public defender Aber testified that if called, a defense attorney's primary responsibility would have been to talk Neal into turning himself in. In response to a question as to whether it would be appropriate for a defense attorney to have advised Neal to stop talking to the police, Aber also testified that it would be "totally proper for a lawyer to tell a client to exercise his right against self-incrimination."

The witnesses are in agreement on this particular point, for good reason. Any one who has been involved with the criminal justice system is well aware that a competent defense attorney will, and should, advise a client to stop talking to the police so as prevent the suspect from incriminating himself. In almost any instance, it would be reprehensible for a prosecutor to pose as a defense attorney so as to keep a suspect talking, particularly if the purpose was to elicit damaging statements. But that is not the circumstance here.

The tapes introduced into evidence show that Neal repeatedly emphasized his obsession with trust. Over the course of many hours, Detective Zimmerman gained Neal's trust, and as pointed out by the majority, was ultimately able to convince him to turn himself in. However, at the time that Neal requested an attorney, he was still not ready to actually surrender. This was made clear in a conversation subsequent to Pautler's in which Neal's friend (the broadcast journalist), tried to cajole Neal into starting the process of turning himself in. It was only after Zimmerman got back on the phone that Neal finally agreed to work out the details of his surrender and follow through.

Whether or not a public defender would have been able to accomplish the same result is not at issue. What is at issue is Pautler's state of mind, and I find it plausible and credible that he, Zimmerman, and the rest of the law enforcement team found it intolerable that their contact with Neal might be cut off at such a crucial juncture in the negotiations. Without opining as to whether Pautler followed the correct course of action, I do not find any evidence to attribute Pautler's statement (that he did not want a defense attorney to tell Neal to stop talking to the officers) to anything but a legitimate desire to keep Neal in contact with the negotiators for the purpose of effectuating his surrender.

Other evidence also belies the inference that Pautler was motivated by a desire to keep Neal talking about his crimes. The tapes show that by the time Neal requested a lawyer, he had already confessed, in great detail, to the crimes he had committed. In the short conversations that Pautler had with Neal, there was no attempt to elicit any information, and the tapes further show that after those conversations, the entire focus of the communication was to bring Neal into custody. There is furthermore no evidence to indicate that between the time that Neal was apprehended and the following morning, at which time Aber was appointed to represent him, that anyone tried to elicit any damaging information from Neal.

As Pautler himself now admits, the better course would have been for him to have contacted the public defender soon after Neal's apprehension and inform them of the ruse. However, in light of the other evidence produced at the hearing, the fact that Pautler did not personally advise the public defender of the deception is not enough to prove that he wanted Neal to keep incriminating himself. Although I find Pautler's explanation, that he knew that the public de-

fender would eventually learn of the ruse through discovery, to be somewhat cavalier, I do not find evidence to attribute a more duplicitous purpose to his silence. I therefore do not find that the aggravating factor of a selfish or dishonest motive has been established to a clear and convincing standard.

## II. Actual and Potential Harm

I do not find, as an aggravating factor, the potential harm presented by the fact that Neal could have detected Pautler's deception. Had Pautler, as emphasized by the People's expert witness Sears, instructed a law enforcement officer to pose as a public defender, no ethical violation would have been found. Yet the risk would have been as great, if not greater, that Neal would have detected a deception. I do not disagree with the concept that it is important for attorneys not to personally perpetuate deceit, but that is not the point considered here. With regard to the issue of potential harm, I do not find that it arose solely and ineluctably as a result of unethical conduct. Nor do I find that Pautler's recognition that disastrous results could have ensued, had Neal discovered his ruse, to be particularly alarming in light of the risks that Pautler also perceived to be inherent in the other alternatives.

I do find that Pautler could have mitigated any potential or actual harm by contacting the public defender soon after Neal's arrest and advising them of what had occurred. Pautler testified that he knew his actions would be called into question, which shows that he anticipated that some issue would later arise, but on this record it is impossible to say more. I find only that Pautler knew that some issue would be raised, and based upon his experience, that he should have foreseen some challenge to the criminal proceedings which might have been moderated had he expeditiously disclosed the night's events to the public defender. I therefore find this failure to mitigate to be an aggravating factor.

## III. Precedent from Prior Cases

Because I do not find that the aggravating factor of a selfish or dishonest motive has been established, I also find that most of the cases cited by the majority are not applicable here. In each of those cases in which a substantial sanction was imposed, the violation was committed for reasons of personal gain, sloth, or to skew the legal process to gain a tactical advantage. There are very few cases in which it was found that the attorney had a "good" motive underlying his violation. *See People v. Reichman,* 819 P.2d 1035 (Colo.1991); *In the Matter of Malone,* 105 A.D.2d 455, 480 N.Y.S.2d 603 (N.Y.App. Div.1984); *In the Matter of John Matthew Chancey,* No. 91CH348, (Review Board of the Illinois Attorney Registration and Disciplinary Commission, April 21, 1994). In these cases, the most serious sanction was public censure. To the extent that prior cases should influence the imposition of a sanction, I find that these cases are more persuasive.

## IV. Pautler's Failure to Recognize His Improper Conduct

As pointed out by the majority, an aggravating factor under § 9.22(g) is presented due to Pautler's testimony that if confronted with the same situation, he would do the same thing. Although I find it distasteful to second guess Pautler's actions and choices that night, and even have sympathy for the situation in which he found himself, I cannot agree with his belief that he does not, even in this extreme situation, have an obligation to obey the ethical rules.

Nevertheless, even though I agree that this aggravating factor is present, and that it is serious, I do not find that Pautler poses a risk to the Rules of Professional Conduct that is implied by the majority. Pautler has no prior disciplinary history, and enjoys a reputation for integrity even among the attorneys who have filed this grievance against him. If he is again struck by lightning, and placed in this extraordinary circumstance, his actions can be judged accordingly at that time. But I find nothing in the record to suggest that he poses a substantial risk of violating the rules again, or does not take his ethical obligations seriously. On the contrary, the testimony presented shows that he has, until this point, followed them faithfully.

This is not to say that this aggravating factor should not be given some weight, only that I believe that the majority has accorded it too much weight because of its concern that Pautler poses a risk of ongoing violations, and that his sanction should serve as a lesson to deter similar conduct lest his example open the doors to "justifiable deception." I find no need to make an example of Pautler, because I perceive no general threat that other attorneys will see his case as an excuse to disregard the rules. The great majority of attorneys are motivated by a desire to conduct themselves ethically and avoid *any* violation. The fact that Pautler has been found in violation is itself a sufficient message, if one is needed, and increasing the sanction for this purpose is not necessary. Moreover, I do not find deterrent aimed at the legal community to be an appropriate factor in imposing sanctions on an individual.

Finally, I am concerned about the precedent this will set for future cases. Pautler's assertion that he would do the same thing is his, and his alone. The unfortunate consequence, however, is that the bar for violations of Colo. RPC 8.4(c) and Colo. RPC 4.3 has now been set at a 90–day suspension, even in cases where substantial mitigating circumstances, including imminent harm to the public, no prior disciplinary history, cooperation with disciplinary counsel, the belief of other prosecutors that the violation was ethical, and excellent reputation, exists. Before this case, such a sanction was reserved for conduct that was far more self-serving and calculated. I find no reason to so precipitously raise the standard.

Absent the aggravating factors of failure to mitigate and refusal to recognize wrongful conduct, I would have found the sanction of public censure to be appropriate. Even so, a period of suspension should be minimal and held in abeyance pending a shorter period of probation.

For these reasons, I respectfully dissent from the majority's decision with regard to the imposition of the sanction.

### IV. ORDER

It is therefore ORDERED:

1. Mark C. Pautler, registration number 06438, is SUSPENDED from the practice of law for a period of three months.

2. The period of suspension from the practice of law is stayed and Mark C. Pautler is placed on probation for a period of twelve months. During the period of probation, Mark C. Pautler's practice of law is subject to the following terms and conditions:

 A. Pautler will take and pass the Multistate Professional Responsibility Examination.

 B. Pautler will take 20 hours of accredited Continuing Legal Education in ethics in addition to that required by C.R.C.P. 260.2.

 C. In all professional encounters subject to the prohibitions of Colo. RPC 4.3, Pautler shall be accompanied by and directly supervised by another attorney who has been licensed to practice law in Colorado for at least five years.

 D. Pautler shall not engage in any conduct which results in the imposition of any form of discipline as provided in C.R.C.P. 251.6 or C.R.C.P. 251.7; an order of immediate suspension as provided in C.R.C.P. 251.8 or 251.8.5 or the filing of a Complaint provided in C.R.C.P. 251.14.

 E. Failure to comply with any term or condition of the probation shall constitute grounds for revocation of the probation and imposition of the period of suspension.

3. Mark C. Pautler is ORDERED to pay the costs of these proceedings within sixty (60) days of the date of this Order.

4. The People shall submit a Statement of Costs within ten (10) days of the date of this Order. Respondent shall have five (5) days thereafter to submit a response thereto.